QUACKENBUSH *v.* QUACKENBUSH.

1. APPEAL AND ERROR—CHANCERY CASE—ISSUES OF FACT—FINDING OF THE TRIAL JUDGE.

The conclusion of the trial judge on an issue of fact in a chancery case will not be disturbed when fairly supported by the testimony inasmuch as the trial judge sees and hears the witnesses and is in a better position to judge their credibility.

2. SAME—CHANCERY CASES—REVIEW DE NOVO—RECORD.

In reviewing a chancery case *de novo* the Supreme Court reviews the record to determine the equities.

3. Specific Performance—Land Contract—Record—Payment.
   In son's suit to enjoin prosecution of parents' summary pro-
   ceedings to oust plaintiff from possession of 20 acres of land
   and to compel defendants to convey premises to him pursuant
   to land contract, record justified finding of circuit judge that
   plaintiff was to have such land and had paid for it.

Appeal from Kent; Verdier (Leonard D.), J.
Submitted April 9, 1943. (Docket No. 41, Calendar
No. 42,331.) Decided June 7, 1943.

Bill by Glenn Quackenbush against Norman A.
Quackenbush and wife to enjoin summary proceed-
ings and to compel execution of a conveyance of
land to plaintiffs. Cross bill by defendants against
plaintiff to reform a contract, for a money decree
and foreclosure of land contract. Decree for plain-
tiff. Defendant appeals. Affirmed.

*Thomas D. Anderson,* for plaintiff.

*Pleasant I. Phillips,* for defendants.

BOYLES, C. J. Plaintiff is a son of the defend-
ants and this case arises out of the failure of these
parties to have a definite understanding as to their
respective rights in a 20-acre piece of real estate.
As a result, plaintiff filed this bill in chancery seek-
ing to enjoin the defendants from further prosecu-
tion of summary proceedings to oust plaintiff from
possession; and to compel defendants to convey this
property to plaintiff. The defendants filed a cross
bill claiming that plaintiff had failed to comply with
the terms of a contract under which defendants were
to convey said premises (incorrectly described in
the contract) to plaintiff, asking that said descrip-
tion be reformed, and that plaintiff be compelled to
pay an unpaid balance claimed to be due on said
contract.

The circuit judge who heard the testimony decreed that defendant Lena Quackenbush (who held the record title) execute and deliver to plaintiff a good and sufficient conveyance of said 20 acres, and that the defendants be restrained from taking any steps to oust plaintiff from possession. Defendants, on appeal, insist that there was a legal land contract under which plaintiff was in default, and that defendants were entitled to have the relief sought, enforcement of the contract.

We are confronted solely with issues of fact. The rule is well established that the conclusion of the circuit judge will not be disturbed when fairly supported by the testimony, inasmuch as the trial judge sees and hears the witnesses and is in a better position to judge their credibility. However, we review chancery cases *de novo,* and we have therefore reviewed the record in this case to determine the equities.

We find that the exhaustive opinion of the court below is fully supported by the testimony. We quote it in part with approval:

"In 1926 plaintiff was the owner of a modest home near Fisher Station where he lived with his family. At the same time defendants owned a piece of land near Ross Station, the value of which consisted mainly in the fact that on it was a gravel pit.

"In 1930, plaintiff and his father entered into a trade of these two pieces for a farm in Algoma township with one Noble Heft, whose title at that time covered only 30 acres, subject to a mortgage for $750. There was a verbal understanding between the father and the son that the son should have the east 10 acres on which there was an old house; and that the father should have the west 20 acres; each turning in his property on the trade and each to pay one-half of the mortgage on the farm acquired.

Title was taken in the mother's name. Later another 10-acre piece between the two was acquired also in the name of the mother but with the understanding that it should be added to the son's 10-acre piece.

"As to how the son was to pay his one-half of the mortgage is left in such uncertainty by the conflicting testimony of the parties that it would stagger the wisdom of a Solomon to determine what the arrangement was.

"The son says that he has paid his one-half of the mortgage by furnishing a cow, a sow, some pigs, some produce, some labor and some board and room to his father and mother, which together are worth a sum far in excess of the amount he was to pay.

"The father says that he paid about $520 on the son's place at Fisher Station and that this was to be added at least in part to the one-half of the mortgage debt to be paid by the son for his half of the farm. But in the next breath he says that when the son had paid down his half of the $750 mortgage he would owe nobody. The father denies that the son was to be given any credit for crops, provisions or labor and while he admits credit was to be given the son for the cow, sow and pigs, such credit was applied on the son's share of the mortgage.

"For a period of four years the deal continued under this wholly uncertain verbal arrangement. Then in 1934, the parties relying on their own knowledge got some land contract blanks and drafted a land contract. It provides for the sale of one-half of the farm by the father and mother to the son, with an erroneous description, for the sum 'of $1,000 in manner as follows, *viz.*: One dollar per week____ dollars heretofore paid____and the remaining 675 ____' (nothing being said as to how that should be paid).

"Later (but probably dated back to the time of the first [so-called] written contract), another written contract was substituted, again with an erro-

neous description, with the price again given as $1,000 payable '$6 per month——dollars heretofore paid——and the remainder $500' (without further specifications as to payments). This constitutes what the plaintiff has to show his interest in land which he has occupied and improved from 1930 to the present time. * * *

"The price named in the contracts ($1,000) remains wholly unexplained. The parties are wholly in disagreement as to how the payments were to be made, at least one of the witnesses not even agreeing with himself in his versions of the arrangement. The only thing on which they agree is that the son did turn over a cow, a sow and some pigs for which he was to be given credit on the contract. The father says that the difference between the $675 balance due in the first contract and the $500 in the second represents credit for the cow, sow and the pigs and that this credit was given between the making of the first and second contract. The mother says that credit was to be $100 and she so indorsed it on the contract. The son says that the credit was given after the second contract was made.

"It is probably true that no payments have been made by the son or credits granted him on the contract for the last four or five years. With this situation the father and mother commenced proceedings before the circuit court commissioner to oust the son and his family from the premises. The pending suit was then commenced to enjoin the proceedings before the commissioner and to compel performance of the contract by conveyance to the son.

"The difficulty confronting the court is to determine from the garbled testimony presented what are the facts. They are in such a state of dispute and confusion that it is almost impossible to sift out a satisfactory determination. There are present, however, some factors in the case that aid in solving the puzzle. In 1938 a suit was commenced

against the father and the son was made a garnishee defendant. His mother wrote him to disclose that he owed nothing and the son, believing that at that time his contract had been paid up, made a written disclosure that there was nothing due.

"It is also conceded that neither the father nor the mother has since, or even before that time, ever made a demand on the son until the suit was commenced to recover possession of the premises. * * *

"Taking these known circumstances into consideration I am persuaded that the son owes neither the father or mother anything on the purchase price and that he should have a decree compelling the mother to convey them to him, with the description corrected to comply with the facts, and the temporary injunction heretofore granted be made permanent. But in order that justice may be tempered with mercy, defendant may also have an injunction against plaintiff to restrain him from ousting his father and mother and the survivor of them from the home now occupied by them so long as they live in it until and unless plaintiff makes a bona fide sale of the premises involved in this suit."

Regardless of the tangled skein of events woven by these parties, the record is convincing that it was understood plaintiff was to have the east half of the 40 acres of land. In 1938 defendants deeded the west half to another son. They did not attempt to deed away the east half, claimed by plaintiff. The circuit judge found that it was agreed that plaintiff was to have this part, and had paid for it. We concur.

Affirmed. No costs awarded.

CHANDLER, NORTH, STARR, WIEST, BUTZEL, BUSHNELL, and SHARPE, JJ., concurred.